EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Héctor Vega Rodríguez y otros<br>    Peticionarios<br><br>           v.<br><br>Telefónica de P.R. y otros<br>    Recurridos | Certiorari<br><br>2002 TSPR 50<br><br>156 DPR ____ |

Número del Caso: AC-1998-18


Fecha: 17/abril/2002


Tribunal de Circuito de Apelaciones:
                        Circuito Regional II


Juez Ponente:
                    Hon. Efraín E. Rivera Pérez


Abogado de la Parte Peticionaria:
                        Lcdo. José Juan Nazario de la Rosa



Abogados de la Parte Recurida:
                        Lcdo. Enrique R. Adames Soto
                        Lcdo. Juan Carlos Garay Massey
                        Lcdo. Luis F. Del Valle Emmanuelli
                        Lcdo. Luis F. Juarbe Jiménez
                        Lcdo. John M. García Nokonechna



Materia: Sentencia Declaratoria, Violación a Derechos
        Constitucionales

        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcciones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Héctor Vega Rodríguez y otros

    Peticionarios

        v.                            AC-1998-18

Telefónica de P.R. y otros

    Recurridos

Opinión del Tribunal emitida por la Juez Asociada señora NAVEIRA DE RODÓN

San Juan, Puerto Rico a 17 de abril de 2002

La velocidad vertiginosa a la que avanzan los adelantos tecnológicos ha provocado que los aparatos que hace unos años parecían inventos de la ciencia ficción, hoy sean equipos fácilmente accesibles en el mercado. El ámbito laboral no ha estado inmune a estos cambios. Cada vez son más las empresas privadas que utilizan los adelantos para incrementar la efectividad de sus operaciones. La cultura corporativa ha incorporado la utilización de diversas técnicas de vigilancia electrónica para

fiscalizar la productividad de los empleados, reducir la incidencia de litigios, y promover la seguridad en el taller de trabajo y del taller de trabajo, así como también de la empresa en general.

Sin embargo, la utilización de estas técnicas ha provocado el surgimiento de controversias legales noveles relacionadas con el lugar de trabajo. En el presente recurso examinamos una de éstas. Nos toca determinar si, bajo las circunstancias particulares de este caso, la práctica de un patrono privado de observar y grabar de forma ininterrumpida en cinta de video a sus empleados en un área de trabajo abierta, pero no accesible al público, viola nuestra Constitución.

El presente caso fue resuelto mediante sentencia sumaria. Por consiguiente, resumimos los hechos pertinentes según éstos se desprenden de las respectivas solicitudes de sentencia sumaria, del acta de inspección ocular y de las determinaciones de hecho contenidas en la sentencia.

I

Los señores Héctor Vega Rodríguez y Amiud Reyes Rosado (en adelante los señores Vega-Reyes) eran empleados de la Puerto Rico Telephone Company (en adelante PRTC), la cual era una corporación pública a la fecha de los hechos que dieron lugar a este recurso. Los señores Vega-Reyes laboraban como operadores en el Centro Ejecutivo de Comunicaciones de la empresa (en adelante CEC) ubicado en el último piso del Edificio 1500 de la Avenida Franklin Delano Roosevelt en Guaynabo, Puerto Rico.

Desde el CEC se controlaba la seguridad de la empresa de forma electrónica. A éste se reportaban los sistemas de control de incendios, los detectores de humo, los detectores de calor para fuego, los circuitos de control de acceso, los controles para las puertas de salida de emergencia y el acceso de entrada y salida en todas las instalaciones de la empresa. Como operadores del CEC, los señores Vega-Reyes vigilaban bancos de información en computadoras y monitores para detectar cualquier señal proveniente de los distintos sistemas de seguridad y alarmas ubicados en las instalaciones operadas por la PRTC alrededor de Puerto Rico. De la descripción del puesto se desprende que la función básica de un operador consiste en mantener comunicación y canalizar a las áreas correspondientes averías, situaciones de emergencia, alarmas e irregularidades relacionadas con las operaciones, sistemas equipos telefónicos y controles de seguridad, reportados a través de los equipos electrónicos.

**En el CEC laboraban once (11) operadores, tres (3) supervisores, una (1) secretaria y un (1) gerente. El CEC operaba los siete (7) días de la semana, las veinticuatro (24) horas del día. Los operadores trabajaban en turnos rotativos de ocho (8) horas, lo cual permitía que por lo menos hubiese dos (2) operadores en funciones. Los supervisores también trabajaban turnos rotativos. Sin embargo, podía haber turnos donde los**

**operadores trabajasen sin supervisor. De surgir emergencias en estos turnos, los operadores resolvían la situación y luego le informaban a un supervisor o al gerente.**

El acceso al CEC estaba restringido, solamente el personal previamente autorizado podía pasar. Una persona que interesaba entrar al CEC debía estar autorizada para ello por el Gerente o alguno de los operadores, o pasar por el guardia de seguridad del edificio, firmar el libro de registro, y tomar el ascensor hasta el piso PH. En ambos casos, la persona necesitaba una tarjeta codificada para abrir la segunda puerta de acceso controlado electrónicamente a la entrada misma del CEC.

**El espacio de trabajo de los operadores dentro del CEC era abierto y en forma de "L". Se componía de un área donde ubicaban computadoras y mobiliario de oficina y otra área de monitores. Además, el CEC contenía un área de descanso y un área de oficinas administrativas. El lugar de descanso tenía casilleros (lockers), ducha, cocina y un área de ingerir alimentos. El área administrativa estaba integrada por tres (3) oficinas divididas por separadores para los supervisores y una (1) oficina completamente cerrada para el gerente. Todos los operadores compartían el área de trabajo abierta sin que se hubiese asignado a ninguno de ellos escritorio, computadora, monitor o área de trabajo en particular.**

**En junio de 1994, la PRTC instaló un sistema de vigilancia electrónica y, previa notificación a los empleados, lo comenzó a operar. La notificación informaba del hecho de que se implementaría el referido sistema, pero no detallaba la política de la empresa formulada en torno a su implementación. Tampoco expresaba cómo se regularían los aspectos referentes al uso y disposición de las imágenes grabadas por el sistema y de toda la información que se recopilara por medio de la supervisión electrónica.**

**El sistema de circuito cerrado instalado consistía de cuatro (4) cámaras fijas con lente gran angular (wide angle). Tres (3) de ellas operaban en el interior del CEC y una (1) en la entrada. Además, componen el sistema un (1) monitor y una (1) vídeo grabadora, los cuales estaban ubicados y se operaban desde la oficina del gerente del CEC, el señor Daniel Domínguez. Las imágenes recogidas por las cámaras se reflejaban en el monitor y se grababan de forma continua en las cintas de videograbación.**

**La cámara ubicada en la entrada, que captaba a toda persona que entraba o salía del lugar, no fue objetada por los señores Vega-Reyes. Los peticionarios impugnaron las tres (3) cámaras ubicadas en el interior del CEC. La primera de estas cámaras cubría el área de monitores que medía aproximadamente cuarenta y cinco (45) pies de largo por treinta y seis (36) de ancho. La cámara cubría de un 60% a un 70% del mostrador en forma de "L" donde se encontraban los veintitrés (23) monitores. En dicho mostrador también estaba el teléfono del área de emergencia de los ascensores. En esa área estaba además el sistema de alarmas y tres (3) estaciones de radio. Allí se encontraba también el sistema de "Credifon", de control de fraude, y se obtenía acceso al sistema "Esnet".**

Este último sistema podía activar y desactivar cualquier tarjeta de crédito expedida por la telefónica. Además había un gabinete con llaves maestras de todas las oficinas de la PRTC, externas e internas, y de otras dependencias y áreas.

La segunda cámara dentro del CEC cubría el salón de las computadoras. Esta cámara captaba desde los monitores hasta la mitad de la pantalla del sistema computarizado de seguridad electrónica, el cual mantenía vigilancia electrónica de las oficinas a nivel local e isla. El mismo constaba de doscientos (200) locales instalados que monitorizan los eventos en todas las localidades de la PRTC alrededor de Puerto Rico. Aquí se recibían las llamadas en referencia a los equipos instalados tanto relativos a la seguridad y protección de la empresa, como de clientes regulares, gobierno o agencias federales. El sistema se activaba en casos de emergencia y permitía impartir instrucciones al trabajador que se encontraba en la calle.

La última cámara enfocaba hacia la entrada donde se encontraban los cubículos de los supervisores y la secretaria. El campo de visión excluía las áreas de descanso, cocina o el área de baño y *lockers*.

Las cámaras objetadas se encontraban protegidas por un protector acrílico de color oscuro, no tenían capacidad de hacer enfoques o acercamientos (zoom), no tenían audio, y apuntaban a una dirección fija. Sólo un técnico, de forma manual, podía cambiar la posición de las cámaras. Para que las cámaras tomaran imágenes de diferentes distancias y ángulos había que reemplazar el lente de las mismas.

Las tres (3) cámaras impugnadas recogían imágenes de forma ininterrumpida los siete (7) días de la semana y grababan aunque el televisor estuviera apagado. El gerente o un supervisor designado cambiaba las cintas cada setenta y dos (72) horas. Entonces, las cintas se guardaban en un archivo bajo llave y se mantenía una biblioteca de las cintas identificadas con número, fecha y hora.

Los peticionarios manifestaron, desde que fueron informados de la instalación del sistema, su oposición al mismo.[1] Finalmente, el 8 de febrero de 1995, tras agotar los remedios administrativos que tenían a su alcance, los señores Vega-Reyes, sus esposas y la sociedad legal de gananciales que cada uno integra, presentaron una demanda ante el Tribunal de Primera Instancia, Sala Superior de Bayamón. Alegaron que el sistema de cámaras de seguridad instalado en el CEC violaba los siguientes derechos constitucionales: (i) su dignidad e intimidad conforme al Art. II, § 1 y 8 de Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico; (ii) su derecho a la protección contra riesgos a su salud o integridad personal en su trabajo conforme al Art. II, § 16; (iii) menoscababa su derecho a la libertad de palabra y asociación

---

[1] En 1990 la PRTC instaló por primera vez un sistema de cámaras de circuito cerrado en el CEC. No obstante, en aquella ocasión la empresa desistió voluntariamente de operar el referido sistema de vigilancia electrónica debido a las objeciones presentadas por los empleados.

conforme al Art. II, § 4; y (iv) que dicha intromisión constituía un registro ilegal e irrazonable conforme al Art. II, § 10. Los demandantes solicitaron como remedio compensación por concepto de haber sufrido daños y angustias mentales, al amparo del Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. § 5141.

La PRTC, por su parte, presentó una solicitud de sentencia sumaria el 10 de noviembre de 1995. Alegó, en síntesis, que los señores Vega-Reyes no poseían una expectativa razonable de intimidad en el área de trabajo observada por las cámaras. Sostuvo además que las alegaciones sobre la violación a los derechos de expresión y asociación carecían de fundamento ya que los señores Vega-Rodríguez no identificaron la expresión constitucionalmente protegida que fue restringida. En la alternativa adujeron que cualquier expectativa de intimidad de lo empleados debía ceder ante los intereses apremiantes de seguridad presentes en el caso "debido al tipo de trabajo y función que se lleva a cabo en el CEC." Los señores Vega-Rodríguez se opusieron a esta moción de sentencia sumaria, y solicitaron a su vez que se dictara sentencia sumaria parcial a su favor.

El primer juez a cargo del caso declaró ambas solicitudes de sentencia sumaria sin lugar el 17 de enero de 1996, por entender que en ese momento existían controversias de hechos sustanciales que impedían adjudicar la controversia. El 23 de abril de 1996, la PRTC reprodujo nuevamente su solicitud de sentencia sumaria. Esta vez, tras realizar una inspección ocular del CEC y considerar la oposición presentada por los señores Vega-Rodríguez, un nuevo juez de instancia dictó sentencia sumaria desestimando la demanda.

Tras varios trámites procesales, incluyendo una moción de los aquí peticionarios solicitando al tribunal de instancia determinaciones de hecho y derecho adicionales, los señores Vega-Reyes recurrieron ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito). El 30 de marzo de 1998 dicho foro dictó sentencia mediante la cual confirmó el dictamen apelado.

El 3 de junio de 1998 los señores Vega-Reyes acudieron ante nos mediante recurso de apelación, alegando que los tribunales de instancia y circuito erraron al no declarar la inconstitucionalidad de la práctica de vigilancia electrónica implantada por la PRTC, ya que el sistema de vigilancia y videograbación en su área de trabajo violaba sus derechos constitucionales a la dignidad, intimidad, libertad de expresión y asociación y la protección al trabajador contra riesgos a su salud e integridad personal. Alegaron además que establecer este sistema de vigilancia electrónica, en ausencia de reglamentación específica sobre el uso y disposición del material filmado violaba su derecho a un debido proceso de ley.

El 26 de junio de 1998, la PRTC presentó una moción de desestimación. Adujeron que la moción solicitando determinaciones de hecho y derecho adicionales presentada por

los señores Vega-Reyes no había interrumpido el término para presentar apelación ante el Tribunal de Circuito, por lo que debía desestimarse el recurso presentado por falta de jurisdicción. Como segundo fundamento para desestimación, la PRTC alegó que de acuerdo a la doctrina de cosa juzgada o impedimento colateral por sentencia, los demandantes estaban impedidos de reclamar remedio alguno en los tribunales locales. Esto debido a que los demandantes habían radicado una demanda en el Tribunal de Distrito federal para el Distrito de Puerto Rico, en la cual también impugnaron el sistema de vigilancia de PRTC bajo la Cuarta Enmienda de la Constitución de los Estados Unidos, y la Ley Federal de Derechos Civiles. Dicha acción culminó con una sentencia del Tribunal de Circuito de Apelaciones para el Primer Circuito, de fecha de 8 de abril de 1997, la cual confirmó el dictamen del tribunal de distrito desestimando la reclamación de los aquí peticionarios.

El 6 de noviembre de 1998, acordamos revisar y expedimos el recurso solicitado, acogiéndolo como certiorari. El 4 de diciembre de 1998, los recurridos presentaron una moción en la cual solicitaron nuevamente la desestimación del recurso. El 15 de enero de 1999, emitimos una resolución en la cual ordenamos a las partes presentar sus alegatos dentro de los términos reglamentarios, e indicamos además que consideraríamos oportunamente la moción de desestimación.

Ambas partes presentaron sus alegatos, y con el beneficio de sus argumentos procedemos a resolver.

II

A.

Es necesario que examinemos, en primer lugar, el planteamiento de PRTC a los efectos de que el Tribunal de Circuito carecía de jurisdicción para atender la apelación presentada por los aquí peticionarios ante dicho foro. Las cuestiones de jurisdicción, por ser privilegiadas, deben ser resueltas con preferencia; de carecer un tribunal de jurisdicción, lo único que puede hacer es así declararlo y desestimar el caso. Pagán v. Alcalde Mun. de Cataño, 143 D.P.R. 314, 326 (1997); Autoridad sobre Hogares v. Sagastivelza, 71 D.P.R. 436, 439 (1950).

PRTC alegó que la moción solicitando determinaciones de hecho y derecho adicionales presentada por los señores Vega-Reyes ante el tribunal de instancia no tuvo el efecto de interrumpir el término jurisdiccional de treinta (30) días para presentar el recurso de apelación ante el Tribunal de Circuito. Esto debido a que, aun cuando la moción fue oportunamente presentada, los recurridos alegaron que dicha moción fue radicada con el propósito principal de extender el término para apelar, ya que la sentencia del tribunal de instancia estaba bien explicada. Fundamentan su alegación en lo resuelto por este Tribunal en Andino v. Topeka, Inc., 142 D.P.R. 933 (1997). No tienen razón.

La Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, establece que:

> [A] moción de parte, presentada a más tardar (10) días después de haberse archivado en autos copia de la notificación de la sentencia el tribunal podrá hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes, si es que éstas no se hubieren hecho por innecesarias, de acuerdo con la Regla 43.2, o podrá enmendar o hacer determinaciones adicionales, y podrá enmendar la sentencia de conformidad.

La radicación de una moción bajo esta regla interrumpe el término para presentar reconsideración, moción de nuevo juicio, apelación o certiorari.[2] La razón de ser de esta regla es brindarle al tribunal sentenciador la oportunidad de hacer determinaciones adicionales y enmendar la sentencia de conformidad con éstas. Así pues, resolvimos en <u>Andino v. Topeka, Inc.</u>, <u>supra</u>, que salvo por su efecto incidental, esta moción no tenía el propósito de aumentar el término jurisdiccional para apelar o presentar certiorari.

En el caso de <u>Andino</u> se trataba de una moción solicitando determinaciones de hecho y conclusiones de derecho presentada conjuntamente con una moción de reconsideración, tal y como lo hicieron los señores Vega-Reyes en el caso de marras. En aquella oportunidad determinamos que la moción solicitando determinaciones de hecho y derecho no tuvo efecto interruptor, dado que, excepto por el título de la moción, nada en el escrito indicaba qué determinaciones de hecho y derecho adicionales se estaban solicitando, ni se alegaba la pertinencia de las mismas para revisar la sentencia apelada.

La situación de <u>Andino</u> es distinguible del caso de autos. A poco examinamos la moción presentada por los demandantes, nos damos cuenta que la misma está fundamentada, expone las determinaciones de hecho específicamente solicitadas, y la pertinencia que, según los demandantes, éstas determinaciones adicionales tenían para la evaluación de la sentencia por el tribunal apelativo. El hecho de que el tribunal de instancia declarase sin lugar dicha moción no significa que ésta fuese claramente inmeritoria o hecha con el propósito de extender los términos de revisión de carácter jurisdiccional. De ser así, habría que considerar que toda moción solicitando determinaciones de hecho y conclusiones de derecho adicionales no interrumpe el término para revisar la sentencia si el tribunal la declara sin lugar. Esta interpretación es obviamente contraria al texto mismo de la Regla 43 y a nuestra jurisprudencia interpretando la misma.

PRTC alegó además que por haberse resuelto el caso mediante el mecanismo procesal de sentencia sumaria, los demandantes no tenían por qué solicitar determinaciones de hecho y conclusiones de derecho adicionales. Este planteamiento lo fundamentan en lo dispuesto en la Regla 43.2, que, en lo pertinente, establece que:

> En todos los pleitos, el tribunal especificará los hechos probados y separadamente consignará sus conclusiones de derecho y ordenará que se registre la sentencia que corresponda....

> <u>No será necesario especificar los hechos probados y consignar separadamente las conclusiones de derecho</u>:

> (a)    <u>al resolver mociones bajo las Reglas 10 o 36</u>...

---

[2]    Véase Regla 43.4 de Procedimiento Civil.

Como vemos, la Regla 43.2 establece que no es necesario consignar separadamente las determinaciones de hecho y conclusiones de derecho cuando el tribunal resuelve una controversia, entre otros mecanismos, mediante moción de sentencia sumaria.[3] No obstante, el hecho de que el tribunal no venga obligado a consignar las determinaciones de hecho y conclusiones de derecho separadamente en una sentencia dictada sumariamente, no significa que el tribunal esté impedido de hacerlo si así lo estima conveniente o que las partes no puedan solicitarlo si así lo estiman pertinente. Así lo autoriza expresamente la Regla 43.3, la cual dispone en lo pertinente, lo siguiente:

> No será necesario solicitar que se consignen determinaciones de hechos a los efectos de una apelación, pero a moción de parte... el tribunal podrá hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes, si es que éstas no se hubieren hecho por innecesarias, de acuerdo a la Regla 43.2, o podrá enmendar o hacer determinaciones adicionales, y podrá enmendar la sentencia de conformidad.

Se puede colegir pues, con meridiana claridad, que la moción solicitando determinaciones de hecho y conclusiones de derecho adicionales presentada por los demandantes tuvo el efecto de interrumpir el término jurisdiccional para solicitar revisión al Tribunal de Circuito, por lo que dicho foro tenía jurisdicción para atender el recurso de apelación.

B.

La PRTC también alegó en su moción de desestimación que la doctrina de cosa juzgada es de aplicación al caso de autos, por existir un dictamen del Tribunal de Circuito Federal sobre la controversia, el cual advino final y firme.

Como se sabe, la Regla 6.3 de Procedimiento Civil establece claramente que la cosa juzgada es una defensa afirmativa, la cual es necesario alegar al responder a una alegación precedente, de lo contrario, se entiende renunciada. En este caso, la PRTC estaba impedida, en principio, de alegar la defensa de cosa juzgada al contestar la demanda, ya que los pleitos en el foro local y en el foro federal estaban siguiendo su curso simultáneamente. No obstante, obra en el expediente copia de la sentencia dictada por el Tribunal de Circuito Federal para el Primer Circuito, la cual se dictó el 8 de abril de 1997, sin que surja del expediente que alguna de las partes hubiese solicitado revisión judicial de la misma.

Por su parte, el tribunal de instancia local, emitió sentencia en el caso el 12 de agosto de 1997, notificada la misma el 20 de agosto. Como se puede notar, la sentencia en el foro federal adivino final y firme antes de que el tribunal de instancia local dictase sentencia. Sin embargo, la PRTC no solicitó al tribunal que le permitiese hacer una alegación suplementaria, de conformidad con la Regla 13.4 de Procedimiento Civil, a los efectos de enmendar su contestación para alegar la defensa afirmativa de cosa juzgada. La Regla 13.4 permite hacer alegaciones suplementarias "exponiendo

---

[3]    Regla 36 de Procedimiento Civil.

transacciones, eventos o hechos ocurridos <u>con posterioridad a la fecha de la alegación</u> <u>que se proponga suplementar</u>."

Cabe señalar además que la PRTC tampoco alegó la defensa de cosa juzgada ante el Tribunal de Circuito. Esta alegación la hace por primera vez en el recurso ante nos. Así pues, es forzoso concluir que la PRTC renunció a la defensa de cosa juzgada al no alegarla oportunamente haciendo uso del mecanismo contemplado en la Regla 13.4 de Procedimiento Civil.

Atendidos estos extremos, pasemos a analizar el reclamo constitucional de los demandantes.

### III

Es necesario aclarar que la PRTC fue privatizada durante el trámite del presente recurso. En vista de ello, no entraremos a discutir los planteamientos constitucionales de los demandantes que requieren para su invocación la presencia de una actuación gubernamental (*state action*), entiéndase la protección contra registros y allanamientos irrazonables, Art. 10 § 2 de la Constitución del Estado Libre Asociado, la libertad de expresión, Art. II §, y la violación a la cláusula constitucional del debido procedimiento de ley, Art. II § 7 de nuestra Constitución.[4] Analizaremos este caso bajo los derechos

---

[4] Aun cuando reconocemos que la PRTC desempeña una función pública importante, y que está en gran medida reglamentada por el Estado, los apelantes no han puesto al Tribunal en posición de evaluar cómo las acciones de la PRTC pueden seguir siendo consideradas "state action" aun después de haber sido privatizada esta entidad. Nótese que el recurso fue presentado a este Tribunal el 3 de junio de 1998. Ya para el mes de mayo de 1998 se había anunciado la venta de la Telefónica de Puerto Rico a manos privadas. La venta se completó durante el transcurso de ese mismo año. Si bien al momento de la presentación del recurso de apelación la PRTC todavía pertenecía y estaba bajo el control del gobierno del Puerto Rico, a partir de por lo menos julio de 1998, esa situación cambió, por tanto, los peticionarios tenían la obligación de hacer los planteamientos correspondientes en cuanto a cómo la privatización de la PRTC afectaba las reclamaciones de éstos que requerían acción gubernamental. Esto pudieron haberlo hecho al momento de presentar su alegato ante nos, **el 20 de abril de 1999,** <u>**fecha a la cual ya había transcurrido casi un (1) año de haberse**</u> <u>**privatizado la PRTC**</u>.

Por otra parte, aun cuando aceptáramos, para efectos de argumentación, que las actuaciones de PRTC pueden ser consideradas "state action", los planteamientos de los peticionarios con respecto a estos extremos no son suficientes para hacer una determinación de que efectivamente las acciones de la PRTC violaron dichos derechos constitucionales. En cuanto a la violación al debido procedimiento de ley, los apelantes se limitaron esencialmente a señalar que la ausencia de reglamentación sobre el sistema de vigilancia establecido por la PRTC viola dicha cláusula constitucional. No obstante, no surge de los autos ni del recurso presentado que los apelantes hayan solicitado en alguna oportunidad examinar el material grabado o impugnar el mismo y que se le haya negado dicha solicitud, de manera que haya quedado establecido que algún interés propietario o libertario se haya visto directamente afectado por la ausencia de dicha reglamentación o procedimiento. En estas circunstancias, consideramos que un planteamiento sobre violación el debido procedimiento de ley resulta prematuro.

a la dignidad e intimidad, los cuales operan *exproprio vigore* y son oponibles a un patrono privado.  Arroyo v. Rattan Specialties, 117 D.P.R. 35 (1986).

El derecho a la intimidad y la protección extendida a la dignidad del ser humano no son en nuestro ordenamiento entidades errantes en busca de autor o encasillado jurídico. La constitución las consagra en textos claros.[5]  El Art. II § 1 de la Constitución del Estado Libre Asociado de Puerto Rico establece la inviolabilidad de la dignidad del ser humano como principio básico que inspira la totalidad de los derechos reconocidos en ella. Así lo confirman las expresiones de la Convención Constituyente en torno a la referida sección de nuestra Ley Fundamental:

> El propósito de esta sección es fijar claramente como base constitucional de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional.[6]

Por otra parte, el Art. II § 8 de nuestra Constitución dispone que "toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, vida privada o familiar." Esta sección consagra expresamente el derecho a la intimidad en Puerto Rico.  Véase Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978); El Vocero v. E.L.A., 131 D.P.R. 356 (1992).

**De acuerdo con esto, hemos establecido que el derecho constitucional a la intimidad es uno de la más alta jerarquía en nuestro ordenamiento jurídico.  No obstante, no es un derecho absoluto, ni "vence a todo valor en conflicto bajo todo supuesto posible." E.L.A. v. P.R. Tel. Co., 114 D.P.R. 398, 401 (1983).  El mandato constitucional de que se proteja a las personas contra ataques abusivos a su intimidad tiene por fuerza que examinarse teniendo presente consideraciones de tiempo y lugar.  Pueblo v. Falú Martínez, 116 DPR 828, 838 (1986).  Por lo tanto, ante un reclamo de violación a este derecho**

---

Con respecto a la alegada violación a la libertad de expresión y asociación, los apelantes se limitan exponer la normativa sobre el asunto, pero no plantean cómo el hecho de la grabación viola dicha cláusula constitucional en su situación particular de empleo. Por último, en relación a la protección contra registros y allanamientos irrazonables, la contención de los apelantes es que la observación continua por medio de cámaras constituye una registro administrativo no justificado que no cumple con el criterio de razonabilidad.  No obstante, los apelantes no alegan cómo el sistema, más allá del hecho de la mera observación, constituye un registro administrativo.  Por otra parte, toda la discusión posterior sobre la normativa de los registros a empleados públicos no parece ser de aplicación a los señores Vega-Reyes, en vista de que en virtud de los cambios habidos en la PRTC, éstos son empleados privados.  Además, el caso en el cual los apelantes fundamentan su contención, O'Connor v. Ortega, 480 U.S. 709 (1987) presenta una situación muy distinta a la de autos, en la cual el Sr. Ortega, empleado público, fue objeto de un registro en su oficina, en el que inclusive, allanaron propiedad personal de su escritorio y sus archivos personales.  Claramente la situación de autos es diametralmente distinta, y no resulta razonable utilizar los criterios establecidos por el Tribunal Supremo de los Estados Unidos en O'Connor para analizar el sistema de vigilancia que está en controversia aquí.

[5]   Raúl Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, Vol. II, Primera Ed. 1988.  Pág. 1024.

[6]   4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 1951, pág. 2561.

constitucional "la cuestión central es si la persona tiene derecho a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete." E.L.A. v. P.R. Tel. Co., supra, pág. 402, citando a Katz v. United States, 389 U.S. 347 (1967). (Énfasis suplido.)

Para que esa expectativa de intimidad sea razonable deben concurrir dos elementos: (1) que el reclamante, dentro de las circunstancias de su caso, tenga una expectativa real de que su intimidad se respete (criterio subjetivo) y (2) que la sociedad esté dispuesta a reconocer esa expectativa como legítima o razonable (criterio objetivo). Véase Pueblo v. Santiago Feliciano, 139 D.P.R. 360, 384 (1995). Aunque dichos criterios han sido aplicados generalmente en casos de naturaleza criminal, muy especialmente en el contexto de los registros y allanamientos irrazonables,[7] esto no obsta para la aplicación de este análisis constitucional sobre el derecho a la intimidad en otros contextos. Por el contrario, el derecho a la intimidad ha sido reconocido y sostenido en el ámbito de las investigaciones de carácter administrativo,[8] en el área de las relaciones de familia,[9] y también en el hogar.[10]

Igualmente, hemos reconocido el derecho a la intimidad en el lugar de trabajo, ya que "por tratarse de un derecho invocable frente a personas privadas, un patrono viene obligado a no infringir la zona de autonomía individual de sus empleados que protege el derecho a la intimidad" Soc. de Gananciales v. Royal Bank de P.R., res. el 1 de abril de 1998, 145 D.P.R. _____ (1998), 1998 T.S.P.R. 36, 98 JTS 37, pág. 751. Así pues, en Puerto Rico, un patrono privado viene obligado a respetar el derecho a la intimidad de sus empleados, de la misma manera en que un patrono público tiene que hacerlo.

En Arroyo v. Rattan Specialties, supra, tuvimos la oportunidad de examinar el derecho a la intimidad del empleado vis a vis el derecho del patrono a proteger su propiedad privada. Se trataba en ese caso de una compañía privada, Rattan Specialties, que requería a sus empleados someterse a una prueba de polígrafo, e imponía como sanción última el despido del empleado que reiteradamente se negase a someterse a la prueba. Al interpretar los conceptos de dignidad, intimidad e integridad personal dentro del contexto laboral este Tribunal expresó que:

> [L]os derechos a la dignidad, integridad personal e intimidad son los derechos constitucionales fundamentales que gozan de la más alta jerarquía y constituyen una crucial dimensión en los derechos humanos. Su protección es necesaria para que se pueda lograr una adecuada paz social o colectiva. Una persona respetada en su intimidad y dignidad – que no es otra cosa que el amplio y en ocasiones complejo mundo interior individual– sentirá y vivirá la paz, el respeto y la consideración merecida por todo ser humano en una sociedad. Es de esperarse, pues, que esos mismos sentimientos, vitales

---

[7] Véanse Pueblo v. Santiago Feliciano, supra; P.R. Tel. Co. v. Martínez, 114 D.P.R. 328 (1983); Pueblo v. Yip Berríos, 142 D.P.R. 386 (1997).

[8] Véase RDT Const. Corp. v. Contralor I, 141 D.P.R. 424 (1996); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987).

[9] Véase Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978).

[10] E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436 (1975).

para una ordenada, racional y pacífica convivencia social, sean proyectados de manera efectiva a nuestro orden social. <u>Arroyo</u> v. <u>Rattan Specialties, Inc</u>, <u>supra</u>, pág. 62.

Frente al reclamo del patrono de su derecho al pleno disfrute de su propiedad privada, garantizado en el Art. II § 7 de nuestra Constitución, concluimos que una prueba de polígrafo obligatoria en el lugar de empleo constituía una violación al derecho a la intimidad del empleado, <u>en ausencia de circunstancias apremiantes o sospechas que justificaran el uso de dicho mecanismo</u>. Al así resolver, consideramos, entre otros factores, el hecho de que la prueba del polígrafo interviene directamente con los pensamientos e ideas de la persona, los cuales gozan de una gran expectativa de intimidad.

La situación a la cual nos enfrentamos en el caso de autos es distinta. Aquí el patrono, PRTC, estableció un sistema de vigilancia electrónica mediante una tecnología sofisticada, creada con el propósito legítimo de proteger equipo de vital importancia para el área de las telecomunicaciones en Puerto Rico. No cabe duda que las operaciones que se llevan a cabo en el CEC son altamente especializadas, y requieren una vigilancia especial. Por estas razones es particularmente difícil en el caso ante nos trazar la línea divisoria entre el derecho a la intimidad de los empleados demandantes, y los intereses de la PRTC de proteger su propiedad privada haciendo uso de tecnologías modernas que, como cuestión de hecho, son parte de la realidad de la empresa del nuevo siglo.

IV

En los últimos años el uso de diversos mecanismos de vigilancia electrónica hacia los empleados en el sector privado ha sido objeto de estudio y debate. Para el 1996, el *American Civil Liberties Union National Task Force on Civil Liberties in the Workplace* estimó que alrededor de 40 millones de trabajadores estaban sujetos a algún tipo de vigilancia electrónica. Por otra parte, estudios del *American Management Association* indican que, para el año 1997, al menos dos terceras partes de sus miembros utilizaban algún tipo de vigilancia electrónica hacia sus empleados.[11]

Por otra parte, numerosos artículos han discutido las ventajas y desventajas de este tipo de vigilancia, y su relación con el derecho a la intimidad de los empleados. En la jurisdicción norteamericana el problema se intensifica debido a que, al menos en la esfera privada, los empleados no parecen estar protegidos por disposición constitucional específica alguna contra invasiones del patrono a su derecho a la intimidad, al menos en

---

[11] Entre los métodos más populares de vigilancia electrónica se encuentran: los registros electrónicos del tiempo y números de las llamadas hechas y recibidas; revisiones del correo electrónico y de la información procesada por computadoras propiedad del patrono; registro de cuántas teclas por minuto se oprimen desde cada terminal de computadora; intercepción por parte de supervisores de llamadas de servicio al cliente; todo como parte de la vigilancia electrónica (electronic surveillance) en el lugar de trabajo. Véase, S. Elizabeth Wilborn, <u>Revisiting the Public/Private Distinction: Employee monitoring in the workplace</u>, 32 Ga. L. Rev. 825, 826 y nota 4 (1998).

cuanto a vigilancia electrónica se refiere.[12]  Las causas de acción disponibles a los

empleados en la empresa privada contra actuaciones del patrono que atenten contra su derecho

a la intimidad surgen más bien de las acciones en daños y perjuicios reconocidas en el derecho

común por sufrimientos y angustias mentales (intentional infliction of emotional distress)

causados intencionalmente por su patrono.  También se ha reconocido, en el contexto de la

vigilancia electrónica, una acción contra el patrono por intrusión en los asuntos privados

del empleado (intrusion into seclusion).[13]

Por otra parte, el Congreso de Estados Unidos ha intentado aprobar legislación con

el propósito de proteger a los empleados de la empresa privada de cierto tipo de vigilancia

electrónica.  A estos efectos, se aprobó en 1986 el *Electronic Communication Privacy Act*

(ECPA).[14]  En términos generales, esta ley penaliza a cualquier persona que intencionalmente

intercepte, use o divulgue cualquier comunicación oral, telefónica o electrónica.  No

obstante, las prohibiciones de este estatuto no son absolutas, sino que éste provee una

amplia gama de excepciones y defensas para el patrono.

El **intento** más abarcador en la esfera federal por ofrecer una amplia protección a

los empleados, tanto públicos como privados, contra la vigilancia electrónica por parte

de sus patronos lo fue el proyecto de ley conocido como el *Privacy for Consumers and Workers*

*Act* de 1993 (PCWA).[15]  Mediante este proyecto se pretendía evitar abusos por parte de los

patronos que utilizan mecanismos electrónicos de la vigilancia en el lugar de trabajo.  Las

protecciones del PCWA cubrían tanto a los empleados públicos como privados.  Entre sus

disposiciones más relevantes estaban aquellas que requerían de los patronos dar aviso sobre

---

[12]  En cuanto a empleados públicos, la protección mayor contra ataques a la intimidad por parte del patrono surge de la Cuarta Enmienda de la Constitución de Estados Unidos, la cual prohíbe los registros y allanamientos irrazonables.  Bajo esta enmienda, el Tribunal Supremo de Estados Unidos resolvió en O'Connor v. Ortega, 407 U.S. 709 (1987), que un empleado tenía una expectativa razonable de intimidad en áreas como su propio escritorio, o los lugares donde guarda expedientes.  El Tribunal también determinó que en este tipo de controversias había que hacer un análisis caso a caso sobre la razonabilidad de la expectativa de intimidad de empleado.

[13]  Debemos señalar en este punto que existe numerosa jurisprudencia en Estados Unidos en cuanto a diversas instancias de vigilancia electrónica a los empleados privados en el lugar de empleo. No obstante, no discutiremos en detalle dicha casuística en razón de que en la jurisdicción federal el análisis jurisprudencial parte de la premisa de que no se ha reconocido expresamente que un empleado privado tenga una derecho a la intimidad en su lugar de empleo, lo cual es contrario a lo que ocurre en Puerto Rico.
Para una discusión sobre jurisprudencia federal relacionada, véase Jeremy E. Gruber, Re: Electronic Monitoring the Workplace: Common Law & Federal Statutory Protection, 651 PLI/Lit. 477 (2001); Edward Herstein, Electronically Monitoring the Workplace: Hoe arbitrarors have ruled, 52-Fall Disp. Resol. J. 36 (1997); David Neil King, Privacy issues in the Private Sector Workplace: protection from Electronic Surveillance and the Emerging "Privacy Gap", 67 S. Cal. L. Rev. 441 (1994).

[14]  18 U.S.C. § 2510-2520.

[15]  H.R. 1900, 103rd. Cong., (1993); S. 984, 103 Cong.,(1993).

el uso de la vigilancia electrónica en el lugar de empleo, limitaban el acceso a la información recopilada mediante los mecanismos electrónicos, y le brindaban la oportunidad al empleado afectado de verificar dicha información. Por último, y aunque con algunas excepciones, el PCWA prohibía a los patronos mantener bajo constante vigilancia electrónica a sus empleados.

Aunque el PCWA contó con apoyo el de varios sectores, la legislación propuesta nunca fue aprobada. A pesar de este fallido intento, los estudiosos no han dejado de puntualizar la necesidad de este tipo de legislación reguladora de las prácticas de vigilancia electrónica, especialmente por parte de los patronos privados. La necesidad de una norma razonable se hace patente debido a que el uso de estos mecanismos de vigilancia es una realidad en la empresa moderna que, en ausencia de regulación adecuada, ofrece unas ventajas obvias para el patrono y se presta para innumerables abusos contra la clase trabajadora.

No cabe duda de que la protección constitucional del derecho a la intimidad del empleado en Puerto Rico es mucho más abarcadora que en el ámbito federal. Aquí hemos reconocido expresamente que al empleado, tanto público como privado, le cobija una expectativa razonable de intimidad en el lugar de trabajo. En razón precisamente de esto, se hace indispensable delimitar el uso de vigilancia mediante electrónica hacia un empleado o área de trabajo, haciendo un adecuado balance entre el derecho del empleado a la intimidad en el lugar de trabajo y el del patrono a la protección, seguridad y disfrute de su propiedad.

V.

En _Arroyo_ v. _Rattan_, _supra_, a la pág. 54, reconocimos la validez de utilizar los avances tecnológicos para mejorar nuestra calidad de vida en general. Sin embargo, advertimos entonces que el abuso de estos avances representaba una seria amenaza para la integridad personal, la intimidad y la dignidad individual de las personas. A los efectos expresamos:

> A pesar de que los avances tecnológicos y científicos usados correctamente pueden resultar de gran beneficio para la sociedad, no se puede perder de vista que éstos son susceptibles a ser mal utilizados y pueden convertirse en instrumentos para esclavizar al hombre y minar lo más preciado para el ser humano: su dignidad, integridad personal e intimidad.

No obstante, en _Arroyo_ no cerramos la puerta al patrono para que éste pudiese utilizar mecanismos de vigilancia electrónica, de quedar establecidas circunstancias o situaciones de hechos que justificasen el uso de éstos.

Al atender la controversia que hoy nos ocupa, es necesario reconocer una vez más que el patrono tiene un derecho a proteger de forma razonable su propiedad privada. La vigilancia electrónica razonable en el lugar de trabajo es una forma legítima para el patrono proteger su propiedad. No podemos negar que este tipo de vigilancia le provee un método efectivo y muchas veces necesario de controlar, por ejemplo, el uso que hacen los empleados

de la propiedad del patrono y de la propiedad en sí.[16] El uso de las tecnologías modernas como el vídeo y el circuito cerrado ayudan a prevenir actos de sabotaje, robos y el mal uso de los recursos disponibles en el lugar de empleo, entre otras cosas. Todos éstos son fines por demás legítimos que nos inclinan a concluir que el uso de mecanismos de vigilancia electrónica en el lugar de trabajo no es inconstitucional per se, y que el mero hecho de hacer uso de éstos no constituye una intromisión impermisible en la intimidad del empleado.

Así pues, será necesario analizar las circunstancias de cada situación o sistema de vigilancia en particular para determinar si éste constituye, ya sea por su naturaleza, o en su aplicación, una intromisión abusiva en la intimidad del empleado, o una violación a su dignidad e integridad. Cualquier evaluación a esos efectos debe comenzar con un análisis de las razones invocadas por el patrono para instalar el sistema, como por ejemplo: (a) seguridad, (b) reducir o prevenir incidencia de sabotaje o robos, (c) evaluar la efectividad o nivel de productividad del empleado, o (d) evaluar el trato que se le da al consumidor o cliente en el negocio. Luego de este análisis inicial, se podrá evaluar (1) cuán intrusivo es el método escogido por el patrono en la intimidad del empleado *vis a vis* el propósito y necesidad de la vigilancia; (2) las características particulares del lugar de empleo, como por ejemplo, si es un espacio abierto o cerrado, y la facilidad de acceso al mismo; (3) las funciones de los empleados observados; (4) la función de las facilidades que son objeto de vigilancia; (5) las capacidades técnicas y de sofisticación del equipo instalado; y (6) la publicación, notificación y utilización que haga el patrono del sistema, entre otras.

En el contexto específico de la grabación en vídeo de determinada área de trabajo, debe considerarse: el campo de visión de las cámaras, su capacidad de hacer acercamientos o enfoques, periodos de tiempo que se encuentran encendidas, si las imágenes se graban o no, el periodo de tiempo durante el cual éstas se conservan, el acceso a las mismas y el uso que se les da, quién asume la responsabilidad por la conservación, control de acceso y disposición del material grabado, la política de la empresa a estos efectos, y la información que se le provea a los empleados sobre el sistema, entre otros.

Reiteramos que en aras de proteger la dignidad del trabajador, un patrono no debe establecer un sistema de vigilancia electrónica sin darle previa notificación a los empleados de la implantación del mismo, excepto en casos en que circunstancias apremiantes lo requieran. La notificación a estos efectos podría incluir, entre otras cosas, información sobre: (a) el tipo de vigilancia a utilizarse; (b) la naturaleza de los datos a obtenerse; (c) la frecuencia con que habrá de usarse el medio de vigilancia; (d) sus especificaciones técnicas; (e) lugar donde se instalará el sistema de vigilancia; (f) localización del equipo de monitoreo; (g) el grupo de empleados que ha de ser observado;

---

[16] Estos mecanismos pueden resultar efectivos para tener control del uso por parte de los empleados de la red de informática *Internet*, del correo

y (h) el mecanismo administrativo disponible para canalizar las quejas de los empleados sobre el particular. Además, la empresa deberá tener una política clara y adecuada sobre el uso, disposición y acceso a la información recopilada, la cual se le informará a los empleados. Por último, como regla general, no se deberá instalar un sistema de videograbación de empleados en áreas en las cuales por su naturaleza, el empleado tenga una marcada expectativa de intimidad tales como los baños, duchas y vestidores (*locker rooms*).

A la luz de estos criterios, pasemos a analizar el caso ante nuestra consideración.

VI

Como ya hemos señalado, el CEC es un área de trabajo donde se realizan funciones altamente especializadas e importantes para el buen funcionamiento del sistema de comunicaciones en todo Puerto Rico. Como cuestión de hecho, las partes han reconocido que el equipo que allí se encuentra es delicado y sirve propósitos indispensables en el sistema de comunicaciones en la Isla. **Desde el CEC se controla todo el sistema de comunicaciones del país tanto su funcionamiento en general como la seguridad del equipo en particular**. Así pues, es inescapable la conclusión de que la PRTC tiene un interés legítimo e importante en proteger el buen funcionamiento del sistema de comunicaciones, y por ende, el equipo que se encuentra en el CEC así como la información que allí se recibe.

Entendemos que el sistema de videograbación electrónica instalado en el CEC es un método adecuado **para efectos de proteger los intereses legítimos de PRTC antes expresados**. El sistema en sí mismo no es impermisiblemente intrusivo en la intimidad de los empleados que allí laboran. Por las funciones realizadas por los operadores del CEC y la naturaleza del sistema de videograbación electrónica, resolvemos que su mera instalación y operación no violó la expectativa razonable de intimidad que ostentan los señores Vega-Reyes en su situación particular de empleo. La vigilancia electrónica en el empleo puede ser una práctica poco agradable, pero ello no la hace necesariamente ilegal e inconstitucional.

No obstante, la falta de reglamentación sobre el uso y disposición del material grabado, y la ausencia de un procedimiento para impugnar o explicar la conducta particular de un empleado del CEC que pueda ser captada por las cámaras, es un impedimento para que la PRTC pueda utilizar el material grabado para otros fines no relacionados con la seguridad en el CEC. La información recopilada por este sistema no deberá usarse indiscriminadamente, ni para cualquier propósito imaginable. En las circunstancias de este caso, la información obtenida deberá utilizarse para propósitos de proteger el equipo, la información y el propio personal del

electrónico, o las líneas telefónicas.

CEC. Así pues, **no deberá usarse esta información como un método para vigilar conducta de los empleados que no esté relacionada con dichos propósitos de seguridad**, como por ejemplo, evaluar la productividad o eficiencia de éstos. La información recopilada por las cámaras tampoco debe ser usada como base para tomar algún tipo de represalia contra los empleados del CEC por en conducta captada que no esté relacionada con las razones de seguridad esbozadas en esta Opinión.[17] De esta forma lograremos un adecuado balance de intereses entre los derechos de PRTC como patrono y los derechos de los empleados del CEC.

VII

Los demandantes también alegaron que por la falta de reglamentación e información en su implementación, el sistema en cuestión viola sus derechos de dignidad e intimidad. No les asiste la razón. Veamos.

Ante los intereses apremiantes de seguridad y buen funcionamiento y protección del equipo ubicado en el CEC, el cual asegura la buena marcha del sistema de comunicaciones en toda el país, los demandados no han establecido hechos concretos que demuestren que en su situación particular, la falta de dicha reglamentación haya afectado su derecho a la intimidad en el lugar de trabajo. Como cuestión de hecho, el expediente está huérfano de prueba relacionada con hechos específicos que tiendan a establecer que efectivamente personas ajenas a las labores inmediatas del CEC tuvieron acceso a la información recopilada, o que dicha información fue utilizada para algún fin indebido o no contemplado dentro del marco de las razones para la instalación del sistema.

Los demandantes fundamentan su argumento en alegaciones generales que no nos permiten evaluar responsablemente cómo la falta de un reglamento provocó que la intimidad de éstos se viese afectada. Sin esa prueba, no estamos en posición de decretar que el sistema es inconstitucional únicamente por el hecho de que no existe una reglamentación específica en cuanto al uso y disposición del material grabado, y mucho menos podemos evaluar los planteamientos con respecto a los alegados daños y perjuicios sufridos por los demandantes.

---

[17] No es la primera ocasión en que establecemos este tipo de limitaciones en aras de proteger el derecho a la intimidad en el lugar de trabajo. En U.T.I.E.R. v. A.E.E., res. el 13 de octubre de 1999, 149 D.P.R. (1999), 99 T.S.P.R. 155, 99 JTS 156, en el contexto de la intercepción de llamadas entre representantes de servicio y clientes de la Autoridad de Energía Eléctrica, establecimos unos límites específicos al uso que se le podía a la información recibida de este tipo de llamadas. Allí establecimos que "[l]o comunicado por el cliente al representante de servicio está sujeto a ser revelado a otros funcionarios de la A.E.E., y aun a determinados terceros, **sólo en la medida en que ello sea necesario para tramitar y atender el asunto planteado por dicho cliente.**" U.T.I.E.R. v. A.E.E., 99 JTS 156, a la pág. 205.

No obstante, creemos necesario enfatizar que es aconsejable que los patronos que decidan instalar sistemas de vigilancia electrónica diseñen un reglamento que regule el uso y disposición de la información recopilada por estos mecanismos.

## VIII

En conclusión, resolvemos que el sistema de vigilancia establecido por la PRTC en el CEC no es inconstitucional per se. El sistema se justifica por los intereses apremiantes de seguridad y óptimo funcionamiento del sistema de comunicaciones en Puerto Rico que PRTC persigue. Además, de los autos no surgen alegaciones o hechos específicos que demuestren que se ha utilizado la información recopilada por el sistema de manera tal que se le haya violado el derecho a la intimidad de los señores Vega-Reyes.

Por todos estos fundamentos, procede confirmar la sentencia dictada por el Tribunal de Circuito de Apelaciones.


Miriam Naveira de Rodón
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Héctor Vega Rodríguez y otros

    Peticionarios


       v.                        AC-1998-18


Telefónica de P.R. y otros

    Recurridos


SENTENCIA


San Juan, Puerto Rico a 17 de abril de 2002


      Por los fundamentos expuestos en la anterior Opinión, se confirma la sentencia dictada por el Tribunal de Circuito de Apelaciones.

      Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Corrada del Río concurre con el resultado sin opinión escrita.  El Juez Asociado señor Rivera Pérez está inhibido.


                             Patricia Otón Olivieri
                                 Secretaria del Tribunal Supremo