Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| OSVALDO FRIGER SALGUEIRO Apelado V. MECH-TECH COLLEGE, LLC; MECH-TECH MANAGEMENT LLC; ARTIFICIAL INTELLIGENCE Apelantes | KLAN202300916 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas Caso Núm.: CG2018CV03195 Sobre: Daños y Perjuicios, Utilización No Autorizada del Derecho a la Propia Imagen |
|---|---|---|

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 31 de mayo de 2024.

El 16 de octubre de 2023, compareció ante este Tribunal de Apelaciones, Mech-Tech College; Mech-Tech Management; LLC, Artificial Intelligence, Corp. d/b/a Artificial Intelligence, Corp; Compañía Aseguradora ABC; Compañía Aseguradora DEF y Compañía Aseguradora XYZ (en adelante, parte apelante) mediante *Apelación Civil*. En la misma, nos solicita que revisemos la *Sentencia* emitida y notificada el 15 de septiembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de Caguas. En virtud del aludido dictamen, el foro *a quo*, declaró con lugar la *Demanda* presentada por la parte apelada, ordenó a Mech-Tech College, LLC (en adelante, Mech-Tech College) a cesar la utilización de cualquiera y todo material en el que se utilizara la imagen de la parte apelada, y a pagarle a esta última la suma de $20,000.00 por la utilización no autorizada de su imagen y $4,000.00 por concepto de honorarios de abogado.

Por los fundamentos que se exponen a continuación, se revoca la *Sentencia* apelada.

**I**

Los hechos que suscitaron la controversia de epígrafe se remontan a una *Demanda* sobre daños y perjuicios y utilización no autorizada de la propia imagen, presentada el 13 de diciembre de 2018, por el señor Osvaldo Friger Salgueiro (en adelante, señor Friger Salgueiro o parte apelada) en contra de Mech-Tech College; Mech-Tech Management; LLC, Artificial Intelligence, Corp. d/b/a Artificial Intelligence, Corp; Compañía Aseguradora ABC; Compañía Aseguradora DEF y Compañía Aseguradora XYZ (en conjunto, parte apelante). Según se desprende de las alegaciones de la *Demanda*, el señor Friger Salgueiro fue empleado de la parte apelante desde el 1ro de enero de 2010 hasta octubre de 2017 y entre sus funciones se encontraba el dirigir y producir videos y/o contenido promocional. Alegó, además, que, la parte apelante había utilizado en más de 380 ocasiones la *propia imagen* de la parte apelada con fines comerciales, mercantiles y publicitarios sin su consentimiento y sin haber mediado una "transferencia escrita", según dispuesto por la Ley Núm. 139 del 13 de julio de 2011 (en adelante, Ley 139-2011). La parte apelada sostuvo que, luego de haberse culminado la relación obrero patronal entre las partes, la parte apelante no solicitó autorización para la utilización y diseminación de videos o el material en los cuales se incluye su *propia imagen*. Expresó que, hasta el momento de la presentación de la *Demanda*, la parte apelante continuaba utilizando su imagen de forma ilegal, no autorizada y sin que el señor Friger Salgueiro le hubiese transferido los derechos sobre su imagen, incluyendo en plataformas como *Facebook, Instagram, Youtube* y por medio de la televisión. Aseguró haber remitido varias misivas a la parte apelante, mediante las cuales solicitó el cese y desista de la alegada conducta, pero que, a

pesar de ello, la parte apelante continuaba utilizando su imagen. A tales efectos, solicitó al foro *a quo* que le ordenara el cese y desista de la utilización de su imagen a la parte apelante, más una indemnización ascendiente a una cantidad no menor de $500,000.00.

En respuesta, la parte apelante presentó la *Contestación a Demanda*. Por medio de esta, negó lo alegado en la *Demanda*. Además, sostuvo que, en la controversia de epígrafe aplicaba la doctrina de "trabajo por contrato", donde una persona no puede reclamar violación al uso de su propia imagen o propiedad intelectual, si recibe paga por contrato para el uso de tal imagen. Acotó que, ostentaba los derechos de propiedad intelectual sobre los videos filmados por la parte apelada, ya que le había remunerado por los aludidos videos. Aseguró que, el señor Friger Salgueiro no era empleado, sino que, era un contratista independiente de Artificial Intelligence, Corp. y que prestaba servicios mediante contrato para el Departamento de Producción de tal corporación. Adujo que, no se encontraba en la obligación de solicitar autorización a la parte apelada para utilizar su imagen, ya que se le había pagado por la producción de múltiples videos publicitarios para el uso de las empresas.

Luego de varias incidencias procesales innecesarias pormenorizar, el 28 de julio de 2021, la parte apelante presentó la *Moción de Sentencia Sumaria* donde reiteró su posición en cuanto a que estaba facultada para utilizar la imagen de la parte apelada y el material videográfico que produjo durante su relación laboral. Asimismo, solicitó la desestimación de la *Demanda* en su contra.

Por su parte, el señor Friger Salgueiro presentó el 7 de septiembre de 2021, la *Oposición a Moción de Sentencia Sumaria y Solicitud para que se Dicte Sentencia Sumaria Parcial Interlocutoria a Favor de Osvaldo Friger Salgueiro*. Por medio de esta, arguyó que,

había brindado su consentimiento tácito para el uso de su imagen mientras trabajó con la parte apelante y mientras recibía una compensación mensual por los servicios prestados. Añadió que, posterior a que la parte apelante diera por terminada unilateralmente la relación laboral entre las partes, tal consentimiento cesó, y que así se lo dejó saber mediante el envío de una misiva de cese y desista. Acotó que, a través de la aludida misiva, le solicitó a la parte apelante que cesara el uso de su imagen. Adujo, además que, luego de que cesara el consentimiento, conforme a la Ley Núm. 139-2011, la parte apelante no estaba autorizada a continuar utilizando la imagen del señor Friger Salgueiro.

Posteriormente, la parte apelante presentó la *Réplica a Oposición a Moción de Sentencia Sumaria*. Sostuvo que, la Ley Núm. 139-2011 no aplicaba en la relación de trabajo entre las partes, puesto que, al momento en que se creó el material videográfico y promocional, esta no estaba en vigor. Acotó que, la parte apelada había consentido sin límites y condiciones al uso del referido material. Igualmente, arguyó que, en caso de que aplicara la aludida ley, esta no requería que el consentimiento fuera por escrito. Añadió que, en el caso de que sí lo requiriese, no existían requisitos de forma del documento donde constase tal consentimiento. Sostuvo, además que, el consentimiento otorgado por la parte apelada no perdió su validez al culminar la relación laboral entre las partes.

Así las cosas, el 1 de diciembre de 2021, fue celebrada una *Vista Argumentativa*. Luego de las partes exponer sus respectivas posiciones, el foro *a quo* determinó que procedería a resolver las mociones dispositivas posteriormente.

Subsiguientemente, el foro *a quo* emitió una *Resolución* en la cual declaró No Ha Lugar las solicitudes de sentencia sumaria presentadas por las partes. Lo anterior, luego de concluir que, existía controversia sustancial sobre el consentimiento de la parte

apelada y su extensión, términos y condiciones, si alguno. De igual manera, determinó que, no contaba con los elementos necesarios para determinar si la parte apelante era dueña de la propiedad intelectual de todos los anuncios, videos y programas creados con la imagen del señor Friger Salgueiro, ya que ello no surgía del expediente.

En desacuerdo, la parte apelante presentó la *Moción Solicitando Reconsideración*. Mientras que, la parte apelada presentó la *Moción en Oposición a Reconsideración*. En respuesta, la parte apelante presentó la *Réplica a Oposición a Moción Solicitando Reconsideración*. Por su parte, el señor Friger Salgueiro presentó la *Enérgica Oposición a "Réplica a Oposición a Moción Solicitando Reconsideración" y Solicitud de Desglose*. El 25 de mayo de 2022, el foro primario declaró No Ha Lugar la moción de reconsideración presentada por la parte apelante.

Transcurridos varios trámites procesales innecesarios pormenorizar, los días 13 y 14 de marzo de 2023 se celebró el Juicio en su Fondo y el 15 de septiembre de 2023, el foro de primera instancia emitió la *Sentencia* cuya revisión nos atiene. En virtud de esta determinó que, todo material utilizado con posterioridad a la presentación de la carta de cese y desista fue sin autorización. De igual manera, a pesar de que dio credibilidad a la continuación del uso de la imagen posterior a la culminación de la relación contractual, no pudo especificarse la cantidad de la ocurrencia ni la cuantía de la monetización supuestamente obtenida o beneficio económico recibido por la parte apelante. A tales efectos, declaró Ha Lugar la *Demanda*, y le ordenó a la parte apelante que cesara de forma inmediata de la utilización de cualquiera y todo material en el que se utilizara la imagen de la parte apelada. En adición, le condenó solidariamente al pago de $20,000.00 por la utilización no

autorizada de la imagen del señor Friger Salgueiro y $4,000.00 por honorarios de abogado.

En desacuerdo, el 20 de septiembre de 2023, la parte apelante interpuso ante el foro primario *Moción Solicitando Reconsideración*, la cual fue posteriormente retirada.

Insatisfecha, la parte apelante con la aludida *Sentencia* acudió ante este foro revisor y esgrimió los siguientes señalamientos de error:

1. Erró el TPI al denegar la moción de desestimación por falta de jurisdicción sobre la materia.

2. Erró [el] TPI al concluir que entre las partes no existía un contrato escrito.

3. Erró el TPI al concluir que las demandadas no podían utilizar el material audiovisual a pesar de ser su dueño.

4. Erró el TPI al imponer a las demandadas el pago de honorarios de abogado.

5. Erró el TPI al conceder $20,000.00 en compensación a pesar de no tener prueba al respecto.

El 5 de marzo de 2024 la parte apelante presentó *Alegato Suplementario de la Parte Apelante.* A su vez el señor Friger Salgueiro presentó *Alegato Suplementario de la Parte Apelada,* el 5 de abril de 2024.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

### A. Propiedad Intelectual

En Puerto Rico los derechos de autor están fundamentalmente protegidos por el Federal Copyright Act, 17 USCA sec. 101 *et seq.,* y por la Ley de Propiedad Intelectual de 1988 y que fuera sustituida por la Ley de Derechos Morales de Autor de 2012 (en adelante, Ley 55-2012). Además, de manera supletoria aplican las disposiciones del Código Civil que no sean incompatibles

con estos estatutos. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 895-896 (2016).[1]

Nuestro ordenamiento jurídico define la propiedad intelectual como "el conjunto de derechos que la ley reconoce al autor sobre las obras que ha producido con su inteligencia, en especial los que su paternidad le sea reconocida y respetada, así como que se le permita difundir la obra, autorizando o negando, en su caso, la reproducción".[2]   Así, a diferencia de otros tipos de propiedad, en ella coexisten valores económicos y espirituales, estos últimos intransmisibles y que facultan a su creador a mantenerla inédita y a renunciar a su autoría, entre otros derechos. C. Rogel Vide, Estudios completos de propiedad intelectual, Madrid, Ed. Reus, 2003, págs. 55-56.

Los derechos sobre las obras se agrupan en dos (2) categorías o facetas: los derechos pecuniarios o patrimoniales —que consisten en el monopolio de la explotación económica de la obra— y los personales o extrapatrimoniales, que protegen el vínculo personal entre el autor y su obra. Estos últimos dan pie a la doctrina del derecho moral.[3]

En Puerto Rico, los derechos patrimoniales están principalmente protegidos por la legislación federal que, en cuanto a su ámbito de aplicación, ocupa el campo.[4]  Así, la ley gobierna los derechos exclusivos especificados en la sección 106 del estatuto federal, con relación a obras pictóricas, gráficas y escultóricas, entre otras, que hayan sido fijadas en cualquier medio tangible de expresión.[5] Estos derechos exclusivos sobre la obra incluyen

---

[1] Art. 12 del Código Civil de 1930, 31 LPRA sec. 12, aplicable al caso de marras. Véanse, además: *S.L.G. Negrón-Nieves v. Vera Monroig*, 182 DPR 218, 224 (2011); *Harguindey Ferrer v. U.I.*, 148 DPR 13, 27 (1999).

[2] *Id.* Véase, además, *Cotto Morales v. Ríos*, 140 DPR 604, 611-612 (1996), citando a J. Puig Brutau, Fundamentos del Derecho Civil, Barcelona, Ed. Bosch, 1973, T. III, págs. 200-201. Véase *Harguindey Ferrer v. U.I.*, supra, págs. 21-22.

[3] *Sucn. Rosado v. Acevedo Marrero*, supra, págs. 896-897; *Ossorio Ruiz v. Srio. de la Vivienda*, 106 DPR 49, 52 (1977).

[4] *Sucn. Rosado v. Acevedo Marrero*, supra, pág. 897.

[5] 17 USCA secs. 102 y 106. Véanse, *Cotto Morales v. Ríos*, supra, pág. 614;

reproducirla, preparar obras derivadas, distribuirla, representarla y exponerla públicamente.[6] De igual forma, la ley los confiere inicialmente a su autor, aunque pueden ser transferidos por este —en todo o en parte— por cualquier medio de transmisión o por operación de ley. Asimismo, reconoce bajo ciertos parámetros la terminación de esa transferencia.[7] Por otro lado, también pueden ser cedidos por testamento o como propiedad personal por las leyes sucesorales estatales.[8]

Es meritorio destacar que, nuestra última instancia judicial ha señalado que, no quedan desplazadas por la legislación federal las acciones estatales que requieren elementos adicionales o distintos a los protegidos por la política federal y si los derechos que se intentan proteger tienen por fuente intereses locales de honda raíz, entre ellos el derecho moral. *Cotto Morales v. Ríos*, supra, pág. 615. Sobre este particular, la Alta Curia ha indicado que algunas de las acciones estatales que no están afectadas por el Federal Copyright Act están fundadas en la violación de un contrato o de una relación fiduciaria, la invasión de la intimidad, la difamación, las prácticas comerciales engañosas y las violaciones al derecho moral de autor, entre otras. *Harguindey Ferrer v. U.I.*, supra, pág. 32; *Pancorbo v. Wometco de P.R., Inc.*, supra, pág. 500 (1984).

---

*Pancorbo v. Wometco de P.R., Inc.*, 115 DPR 495, 499 (1984).

[6] La Federal Copyright Act, 17 USCA sec. 106, provee lo siguiente:
"Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
  "(1) to reproduce the copyrighted work in copies or phonorecords;
  "(2) to prepare derivative works based upon the copyrighted work;
  "(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
  "(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
  "(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
  "(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission".

[7] 17 USCA sec. 203.

[8] La Federal Copyright Act, expresa en lo pertinente: "The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of interstate succession". 17 USCA secs. 201(a) y 201(d)(l).

Los derechos morales, a su vez, están fundamentalmente protegidos por la legislación estatal. Esta reconoce los derechos de los autores como exclusivos de estos y los protege no solo en beneficio propio, sino también de la sociedad por la contribución social y cultural que históricamente se le ha reconocido a la propiedad intelectual. Es por ello, que la ley se fundamenta en facilitar la relación del artista con su obra y en crear un fino balance en cuanto a su control. Así, "[e]l autor [...] tiene el derecho de beneficiarse de ella y las prerrogativas exclusivas de atribuirse o retractar su autoría, disponer de su obra, autorizar su publicación y proteger su integridad, con arreglo a las leyes especiales vigentes sobre la materia". 31 LPRA sec. 1401. Los derechos morales se derivan del nexo existente entre el autor y su creación, independientemente del valor puramente monetario que la obra pueda tener. 31 LPRA sec.1401b. *Harguindey Ferrer v. U.I.*, supra, pág. 28. De esta forma se trata a la obra como una extensión de la personalidad del creador y los derechos sobre ella se consideran exclusivos de su autor.[9] Así, en el derecho civil tradicionalmente se ha clasificado el derecho moral de autor como un derecho personalísimo, junto a otros derechos tales como el derecho a la vida, a la libertad e integridad física, el derecho al honor, a la imagen y otros. *S.L.G. Negrón-Nieves v. Vera Monroig*, supra, pág. 226, citando a *Cotto Morales v. Ríos*, supra, pág. 623.

El artículo 1 de la precitada Ley 55-2012, define al autor como toda "persona natural que genera una obra". Además, define el concepto de obra, como "creación original literaria, musical, visual (plástica o gráfica), dramática o de las artes interpretativas, artística, o de cualquier otro tipo de las que se producen con la inteligencia y

---

[9] Exposición de Motivos de la Ley Núm. 55-2012, 31 LPRA § 1401j. Véanse, además: *Ossorio Ruiz v. Srio. de la Vivienda*, supra, pág. 55; *Pancorbo v. Wometco de P.R., Inc.*, supra, pág. 501.

que sea creativa, expresada en un medio, tangible actualmente conocido o que se invente en el futuro".[10]

### B. Derecho sobre la propia imagen

En nuestro ordenamiento jurídico, el derecho a la propia imagen está cimentado en el derecho a la intimidad, de entronque constitucional. Como sabemos, el derecho a la intimidad está expresamente consagrado en la Sección 8 del Artículo II de nuestra Constitución, el cual dispone que "[t]oda persona tiene derecho a [la] protección de [la] ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Art. II Sec. 8, Const. ELA, *supra.* Por su parte, la Sección 1 del Artículo II establece la inviolabilidad de la dignidad del ser humano como principio básico que inspira los demás derechos incluidos en la Carta de Derechos.[11]

Nuestra última instancia judicial ha expresado que, dada la primacía y la envergadura de este derecho fundamental, la protección a lo privado opera *ex proprio vigore* y puede hacerse valer entre personas privadas, eximiéndolas así, del requisito de acción estatal necesario para activar los derechos constitucionales de los ciudadanos.[12]

En consonancia con lo anterior, y previo a que existiera legislación que expresamente reconociera el derecho sobre la propia imagen en nuestra jurisdicción, entiéndase, normas jurídicas que directamente protegieran la esfera personal consistente en prohibir la reproducción de la propia imagen, nuestro Tribunal Supremo reconoció dicha protección dentro del marco de una acción de daños extracontractuales al palio del Artículo 1802 del Código Civil de Puerto Rico de 1930.[13]

---

[10] Art. 1 de Ley de Derechos de Autor de Puerto Rico, Ley Núm. 55-2012, 31 LPRA § 1401j.

[11] Véase *Vega Rodríguez v. Telefónica de P.R.*, 156 DPR 584, 601 (2002); *Soc. de Gananciales v. Royal Bank de PR*, 145 DPR 308 (1998).

[12] *López Tristani v. Maldonado Carrero*, 168 DPR 838 (2006).

[13] *Colón v. Romero Barceló*, 112 DPR 573 (1982).

Posteriormente, en *López Tristani v. Maldonado Carrero,* supra, la Alta Curia puntualizó que la doctrina civilista reconocía el derecho a la propia imagen como un derecho de la personalidad, protegido por principios constitutivos del ordenamiento jurídico. Sostuvo que, [e]n primer lugar, se considera como imagen la proyección o representación de la figura humana mediante cualquier procedimiento o técnica de reproducción. Añadió que, la imagen propia constituye un atributo fundamental con el cual se individualiza socialmente a la persona; es decir, es parte integral de la identidad del sujeto representado.

Nuestra última instancia judicial, citando al tratadista Eduardo Vázquez Bote, expresó que "[s]obre esa imagen se reconoce un derecho, inherente a la personalidad, que sólo puede actuar, normalmente, el sujeto de la imagen misma".[14] En vista de ello, expresó que la propia imagen es digna de tutela por su estrecha relación con la intimidad de la persona como con su honor.[15]

Posteriormente, en armonía con el marco constitucional y doctrinario previamente reseñado, el 13 de julio de 2011, nuestra Legislatura aprobó, la *Ley del Derecho sobre la Propia Imagen* o Ley Núm. 139-2011[16]. Dicho precepto legal estatuye una causa de acción en daños y perjuicios debido al uso no autorizado de la imagen con fines comerciales o publicitarios. En lo que nos atañe, el artículo 3 de la referida Ley[17], específicamente, dispone que:

> [C]ualquier persona natural o jurídica que utilice la imagen de otra persona con fines o propósitos comerciales, mercantiles o publicitarios, sin el consentimiento previo de ésta, de la persona que posea una licencia sobre tal imagen, de los herederos en caso

---

[14] E. Vázquez Bote, *Los denominados derechos de la personalidad,* Boletín Mexicano de Derecho Comparado, Año VI, Núm. 18, septiembre-diciembre, 1973, pág. 425.

[15] *López Tristani v. Maldonado Carrero,* 168 DPR 838, 850 (2006); C. Fernández Sessarego, *Derecho a la identidad personal,* Editorial Astrea, Buenos Aires, Argentina, 1992, sec. 17, págs. 138-142; J. Santos Briz, *La responsabilidad civil,* Ed. Montecorvo, Madrid, España, 1993, vol. I, págs. 199-201.

[16] 32 LPRA secs. 3151-3158.

[17] 32 LPRA sec. 3152.

de haber fallecido o del agente autorizado de uno de éstos, responderá por los daños causados.

En el evento de no obtenerse el consentimiento requerido en esta Ley, la persona afectada podrá presentar una acción para detener la utilización de dicha imagen y para recobrar los daños causados, incluyendo regalías dejadas de devengar o cualquier pérdida económica resultante de la violación del derecho aquí establecido.

Asimismo, en su artículo 4[18], la aludida Ley provee el remedio de interdicto o una acción en daños y perjuicios, cuando se ha violentado el derecho sobre la propia imagen de un ciudadano y establece el método que ha de utilizar el Tribunal, a los fines de fijar la cuantía a conceder:

[E]l tribunal, en su discreción, podrá fijar la cuantía de los daños en una cantidad que no exceda tres (3) veces la ganancia del demandado y/o la pérdida del demandante cuando determine que la violación fue intencional o de mala fe.

En la alternativa, el demandante podrá optar por solicitarle al tribunal, daños estatutarios. Los daños estatutarios podrán fijarse en una cuantía no menor de $750 ni mayor de $20,000 por violación, según el tribunal lo considere justo. En un caso en el cual el tribunal determine que la violación fue intencional o debido a una negligencia crasa, el tribunal, en su discreción, podrá aumentar la cuantía de daños estatutarios a una suma no mayor de $100,000 por violación.

Ahora bien, la precitada Ley, en su Artículo 8, estableció ciertas excepciones a su aplicación, entre ellas, cuando se utilice la imagen de la persona: *i)* como parte de un reportaje noticioso, *ii)* expresión política, *iii)* transmisión de evento deportivo o artístico, *iv)* una presentación que tenga un interés público legítimo, y *v)* donde no sea utilizada con propósitos comerciales o publicitarios".[19]

## C. Teoría general de los contratos

Es normativa reiterada que, las obligaciones nacen de la ley, de los contratos y cuasicontratos, de los actos ilícitos, u omisiones en que interviene culpa o negligencia, y cualquier otro acto idóneo

---

[18] 32 LPRA sec. 3153.
[19] 32 LPRA sec. 3157.

para producirlas. Art. 1042 del Código Civil[20], 31 LPRA ant. sec. 2992; *Payano v. SLG Cruz-Pagán*, 209 DPR 876,889 (2022); *NHIC et al. v. García Passalacqua et al.*, 206 DPR 105 (2021). Los contratos se perfeccionan cuando median el objeto, consentimiento y causa. Art. 1213 del Código Civil, 31 LPRA ant. sec. 3391. El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA ant. sec. 3371; *Aponte Valentín et al. v. Pfizer Pharm., LLC*, 208 DPR 263 (2021). En nuestro ordenamiento jurídico se ha reconocido el principio de libertad de contratación, el cual permite a las partes pactar los términos y condiciones que tengan por convenientes. *Pérez Rodríguez v. López Rodríguez*, 210 DPR 163 (2022); *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 7-8 (2015); *Arthur Young & Co. V. Vega III*, 136 DPR 157 (1994). No obstante, tal libertad no es infinita, puesto que, encuentra su límite en el Art. 1207 del Código Civil, 31 LPRA sec. 3372. El referido artículo dispone que, los términos y condiciones que las partes establezcan serán válidas cuando no sean contrarias a la ley, la moral, ni al orden público. 31 LPRA sec. 3372; *Burgos López et al. v. Condado Plaza*, supra, págs. 7-8; *Oriental Bank v. Perapi*, 192 DPR 7, 15 (2014). Una vez perfeccionado el contrato, lo acordado tiene fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley". Art. 1210 del Código Civil, 31 LPRA ant. sec. 3375; *Aponte Valentín et al. v. Pfizer Pharm.,* supra; *Payano v. Cruz*, supra; *Burgos López et al. v. Condado Plaza*, supra, pág. 8. Los tribunales estamos facultados para velar por el

---

[20] El derecho aplicable en el caso de epígrafe se remite al Código Civil de Puerto Rico de 1930, puesto que, la presentación de la *Demanda* y los hechos que dan base a esta tuvieron su lugar antes de la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

cumplimiento de los contratos, y no debemos relevar a una parte del cumplimiento de su obligación contractual cuando tal contrato sea legal, válido y no contenga vicio alguno. *Mercado, Quilichini v. UCPR,* 143 DPR 627 (1997).

### D. Honorarios de Abogado

La concesión de honorarios de abogado está regulada por la Regla 44.1 (d) de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 44.1 (d). La misma autoriza al Tribunal a imponer honorarios de abogado cuando una parte o su abogado procede con temeridad o frivolidad. *Pérez Rodríguez v. López Rodríguez,* 210 DPR 163 (2022); *SLG González-Figueroa v. Pacheco Romero,* 209 DPR 138, 145-150 (2022).

De esta manera, la imposición o concesión de honorarios de abogado no procede en todos los casos. Depende, pues, de la determinación discrecional que haga el tribunal en torno a si la parte perdidosa o su abogado, actuaron con temeridad o frivolidad, o de la existencia de una ley especial. *Íd.; Ortiz Valle v. Panadería Ricomini,* 210 DPR 831 (2022). Nuestro Alto Foro ha puntualizado que: "Sin duda, para reclamar honorarios de abogado y los intereses presentencia *es imprescindible* que se haya actuado con temeridad durante el trámite judicial. *SLG González-Figueroa v. Pacheco Romero,* supra, pág. 148. (Énfasis nuestro).

La *temeridad* se define como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables.[21] Sobre este particular, nuestra Máxima Curia ha expresado también que "[l]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento

---

[21] *Íd; Marrero Rosado v. Marrero Rosado,* 178 DPR 476, 504 (2010).

y la administración de la justicia." *Jarra Corp. v. Axxis Corp.*, 155 DPR 764, 779 (2001).

Por otro lado, la frivolidad se define como "aquello que no tiene razón de ser, sin méritos, sin peso ni lógica alguna." *Depto. Rec. v. Asoc. Rec. Round Hill*, 149 DPR 91, 100 (1999). Sólo lo claramente irrazonable o inmeritorio debe dar paso a una determinación de frivolidad por un tribunal apelativo.[22]

En *Feliciano Polanco v. Feliciano González*, 47 DPR 722, 730 (1999), el Tribunal Supremo de Puerto Rico indicó que "[a] modo de ejemplo, constituyen actos temerarios los siguientes:

> cuando el demandado contesta la demanda y niega su responsabilidad total, aunque la acepte posteriormente; cuando se defiende injustificadamente de la acción que se presenta en su contra; cuando no admite francamente su responsabilidad limitada o parcial, a pesar de creer que la única razón que tiene para oponerse a la demanda es que la cuantía es exagerada; cuando se arriesga a litigar un caso del que prima facie se desprende su negligencia; o cuando niega un hecho que le consta ser cierto."

El propósito de la imposición de honorarios de abogado en casos de temeridad es "establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito."[23]

Además, la imposición de honorarios de abogado, tiene como objetivo disuadir la litigación innecesaria y alentar las transacciones mediante la imposición de sanciones a la parte temeraria para compensar los perjuicios económicos y las molestias sufridas por la otra parte. *Fernández v. San Juan Cement Co., Inc.*, 118 DPR 713, 718-719 (1987). Nuestro más Alto Foro ha dispuesto que, la facultad de imponer honorarios de abogados es la mejor arma que

---

[22] *Id.*

[23] *Andamios de PR v. Newport Bonding*, 179 DPR 503, 520 (2010); *Pérez Rodríguez v. López Rodríguez*, supra; *SLG González -Figueroa v. Pacheco Romero*, supra; *Fernández v. San Juan Co.*, Inc., 118 DPR 713, 718 (1987).

ostentan los tribunales para gestionar de forma eficaz los procedimientos judiciales y el tiempo de la administración de la justicia, así como para proteger a los litigantes de la dilación y los gastos innecesarios. *SLG González-Figueroa v. Pacheco Romero*, supra.

La determinación sobre si una parte ha procedido con temeridad descansa en la sana discreción del tribunal sentenciador y no será variada en apelación a menos que se demuestre que éste ha abusado de su discreción. *Pérez Rodríguez v. López Rodríguez*, supra; *SLG González-Figueroa v. Pacheco Romero*, supra. Tampoco será variada la partida concedida a menos que resulte ser excesiva, exigua o constituya un abuso de discreción. *Feliciano Polanco v. Feliciano González*, supra, a las págs. 728-729.

Ahora bien, una vez el tribunal determina que se incurrió en temeridad, está obligado a imponer el pago de los honorarios de abogado a favor de la parte que prevaleció en el pleito. *PR Fast Ferries et al. v. AAPP*, 2023 TSPR 121, 213 DPR ____ (2023) citando a *Torres Montalvo v. Gobernador ELA*, 194 DPR 760, 779 (2016).

### E. Deferencia Judicial

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor posición para aquilatar la prueba testifical. *Argüello v. Argüello*, 155 DPR 62 (2001); *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987); *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011); *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219, (2021).

Como regla general, un Tribunal Apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad para sustituir por sus propias apreciaciones, las determinaciones del tribunal de instancia. *Serrano v. Sociedad Española*, 171 DPR 717, 741 (2007); *Rolón v. Charlie Car Rental*, 148 DPR 420, 433 (1999). Esto es, los tribunales apelativos deben mantener deferencia para con la apreciación de la prueba que realiza el foro primario. *McConnell Jiménez v. Palau*, 161 DPR 734, 750 (2004).

Sin embargo, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos "no debemos intervenir con las determinaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto". *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007); *Santiago Ortiz v. Real Legacy et al.*, supra, pág. 219; *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013 *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 356.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver.

**III**

En sus *tres primeros señalamientos de error*, la parte apelante sostiene que, la primera instancia judicial incidió al: 1) denegar la moción de desestimación por falta de jurisdicción sobre la materia; 2) concluir que entre las partes no existía un contrato escrito y 3) concluir que las demandadas no podían utilizar el material audiovisual, a pesar de ser su dueño. Por estar estrechamente relacionados los tres señalamientos de error, los discutiremos de forma conjunta.

Es la contención de la parte apelante que, al ser titular del material audiovisual en controversia, ostenta todo el derecho de desplegarlo en la Internet y en cualquier otro medio bajo la Ley de Derecho de Autor federal (*Copyright Act*).  Arguye que, el reclamo de la parte apelada al amparo de la Ley del Derecho sobre la Propia Imagen no es otra cosa, sino un intento por limitar los derechos de la parte apelante bajo el estatuto federal.

La parte apelada, a su vez, sostiene que el presente caso no es uno al amparo de la Ley del Derechos de Autor federal, *supra,* sino que su reclamo es al amparo de la Ley de Derecho sobre la Propia Imagen, *supra.*

Para una mejor comprensión del caso, repasamos que, en atención a la moción de sentencia sumaria instada por la parte apelante y su respectiva oposición a la misma, interpuesta por la parte apelada, el 16 de marzo de 2022, el foro primario emitió una *Resolución* en la que determinó como hechos incontrovertidos los siguientes:

1. En o alrededor de noviembre de 2010 el Demandante cursó una propuesta a las Demandadas para la producción de unos infomerciales, en el cual detalló cual sería el proceso de preproducción, producción y postproducción, así como el tiempo requerido para completar esos infomerciales y el pago que estaría cobrando por los mismos.  Dicha propuesta fue aceptada por las Demandadas y el Demandante comenzó a trabajar con los infomerciales.

2. Los videos y/o material videográfico al cual se refiere la demanda, es aquel que fue grabado durante el tiempo que duró la relación de trabajo entre las partes y en los que aparece la imagen y/o voz del demandante.

3. Entre las funciones del demandante eran producir, dirigir, crear y editar videos y contenido que posteriormente era publicado en redes sociales y páginas de internet.  También participaba como "talento" en diferentes videos, contenido y diferentes eventos para representar y promover los productos y servicios de Mech Tech.

4. El demandante otorgó su consentimiento para que su imagen fuese grabada en los referidos videos y

posteriormente publicada en medios sociales durante su relación laboral entre el 2010 y el 2017.

5. Durante el periodo que las partes mantenían una relación laboral entre el 2010 y el 2017, no hubo un solo video de Mech Tech en que la imagen del demandante saliera sin su consentimiento.

6. Según acordado y consentido entre las partes, los videos que el demandante producía o en los que salía su imagen y/o voz, se publicaban siempre en las plataformas de Mech Tech y, a veces, en las plataformas del demandante.

7. Todo el material creado y publicado durante la vigencia de la relación de trabajo fue utilizado con el consentimiento del demandante, pues el acuerdo era producir material para difundirlo

8. El demandante no recuerda haber reclamado titularidad sobre el contenido realizado para Mech-Tech.

9. La propuesta de trabajo original que hizo el demandante a las demandadas era para producir infomerciales. Esa relación de trabajo fue evolucionando a través de los años. El demandante fungió de productor, director, guionista, editor y talento de material videográfico, incluyendo videos y programas de televisión.

10. Al comienzo de su relación de trabajo con las demandadas, el demandante cobraba $3,000.00 mensuales.

11. En enero de 2011, el trabajo del demandante cambió; fue de producir solamente infomerciales a crear y desarrollar otro tipo de material videográfico, incluyendo programa de televisión, anuncios, documentales y otros infomerciales, entre otros roles.

12. El demandante dirigía los segmentos de televisión "Probando Calle" y "Esto es Aquí". En dichos segmentos su imagen era grabada con su consentimiento.

13. El demandante era el director y participaba como narrador en los anuncios en que participaba. También era el director y otras veces productor de los documentales en que trabajó. En algunos de esos documentales salía su imagen. Además, su imagen salía en los referidos anuncios y documentales con su consentimiento.

14. El demandante participaba como director, guionista y talento en los infomerciales en que trabajo. En estos, su imagen siempre fue grabada con su consentimiento.

15. La compensación que el demandante recibió en el periodo de 2010 al 2017 varió en dos ocasiones. Además, cuando viajaba como parte del proceso creativo de material videográfico, se le pagaba un *per diem*.

16. En un correo electrónico fechado 14 de noviembre de 2013, el demandante expresó las razones por las cuales entendía que merecía un aumento de compensación.

17. En un correo electrónico de 23 de mayo de 2014, el demandante expresó todas las funciones que realizaba para Mech-Tech, incluyendo ser la "Imagen del Colegio". El demandante envió esta comunicación como parte de su solicitud para que le aumentaran su compensación.

18. En el verano del 2014 incrementó la compensación del demandante para que continuara realizando sus funciones, incluyendo ser anfitrión ("host") en el material videográfico donde se veía su imagen y se captaba su voz.

19. El demandante aceptó dicho aumento de compensación.

20. La relación de trabajo entre las partes cesó unilateralmente por las deman[da]das en o alrededor la semana después del huracán María.

21. Luego de haber cesado la relación laboral y hasta diciembre de 2017 el demandante publicó en plataformas de redes sociales videos en los que salía su imagen, los cuales fueron creados cuando trabajó para Mech Tech o Artificial Intelligence.

22. El 5 de octubre de 2018, recibida por las demandadas el 17 de octubre de 2018, el demandante curso una carta de cese y desista en la cual expresamente solicitó a las demandadas que cesaran de utilizar su imagen y, además solicitó la remoción de todo material en el cual se utilizara su imagen de toda y cualquier plataforma o medio en el cual las demandadas estuvieran utilizando dicho material, dando así por terminado cualquier acuerdo que hubiera habido entre las partes relacionado a la utilización de la imagen del demandante.

23. Luego de enviada la carta de cese y desista, las demandadas continuaron utilizando la imagen del señor Friger con fines promocionales.

De las anteriores determinaciones del foro primario surge que, tal cual fue alegado en la *Demanda*, el señor Friger Salgueiro fue empleado de la parte apelante desde el 1ro de enero de 2010 hasta octubre de 2017 y entre sus funciones se encontraba el dirigir y

producir videos y/o contenido promocional.  No existe controversia entre las partes sobre que el señor Friger Salgueiro laboró para Mech Tech, a raíz de una propuesta de servicios.  La parte apelante sostiene que el material audiovisual producido por la parte apelada fue realizado por encargo, por lo que es titular del mismo.

La parte apelada sostiene que, luego de haberse culminado la relación obrero patronal entre las partes, la parte apelante no solicitó autorización para la utilización y diseminación de videos o el material en los cuales se incluye su *propia imagen*.  Acotó que, la parte apelante continuaba utilizando su imagen de forma ilegal, no autorizada y sin que le hubiese transferido a esta los derechos sobre su imagen, incluyendo en plataformas como *Facebook*, *Instagram*, *Youtube* y por medio de la televisión.  Aseguró haber remitido varias misivas a la parte apelante, mediante las cuales solicitó el cese y desista de la alegada conducta, pero que, a pesar de ello, la parte apelante continuaba utilizando su imagen.  En vista de lo anterior, acudió ante el foro *a quo* en solicitud de que se le ordenara a la parte apelante el cese y desista de la utilización de su imagen, más una indemnización ascendiente a una cantidad no menor de $500,000.00.

Ahora bien, a los fines de determinar si, en efecto, estamos ante un trabajo por encargo o "*work for hire*", es menester establecer si entre las partes se perfeccionó un contrato que así lo estableciera.  Tal y como fue determinado por el foro primario, las partes iniciaron su relación profesional en virtud de una propuesta que hiciera el señor Friger Salgueiro.  Empero, durante el juicio, la aludida propuesta no fue admitida en evidencia por el Juzgador de instancia.

La parte apelante apoya su contención en el testimonio vertido en corte abierta por la señora Carmen Teresa Vázquez Pérez, directora del Departamento de Contabilidad de Mech Tech, quien trabaja para la parte apelante desde el 23 de septiembre de 1996.

La señora Vázquez Pérez atestiguó que, para ella poder realizar los pagos a nombre de Mech Tech, tenía que existir un contrato. La testigo identificó como el contrato que regía la relación de las partes a la propuesta de la parte apelada.[24]

Durante la vista en su fondo se suscitó una controversia sobre el número de páginas, y por ende, el contenido de la propuesta sometida a Mech Tech por el señor Friger Salgueiro y si el documento presentado en evidencia por la parte apelante era el contrato original o no.[25] Lo cierto es que, durante el juicio en su fondo, la parte apelante intentó sin éxito, autenticar la propuesta que, según aseveró, constituía el contrato entre las partes mediante el cual la parte apelada le cedió la titularidad del material audiovisual en controversia y según lo alegado, exhibido con posterioridad a que cesara la relación profesional entre las partes.[26]

Luego de una revisión ponderada de la transcripción de la prueba oral que nos fue sometida, coincidimos con el foro primario en que la parte apelante no logró demostrar la existencia de un contrato del que surgiera, específicamente, que los trabajos audiovisuales en controversia fueron realizados por encargo. Ambas partes hicieron alusión a una propuesta redactada por el señor Friger Salgueiro, que como mencionamos, no fue admitida en evidencia.

Consecuentemente, en ausencia de un contrato en el que claramente se estableciera el alcance de los trabajos contratados y la renuncia a su titularidad por parte del señor Friger Salgueiro, a cambio de cierta remuneración, no podemos concluir que estamos ante un contrato por encargo o *work for hire*. Colegimos que, ante este escenario, no estamos ante un caso de Derechos de Autor o

---

[24] Véase TPO del 15 de marzo de 2023, pág. 96-105.
[25] Véase págs.161 -169 de la TPO del 14 de marzo de 2023.
[26] Véase TPO del 14 de marzo de 2023, págs. 106-132.

*Copyright* bajo el estatuto federal, por lo que el foro *a quo* ostentaba jurisdicción para entender en la controversia.

En virtud de lo anterior, no erró el foro primario al no desestimar la causa de acción por falta de jurisdicción sobre la materia. Por las mismas razones antes esbozadas, razonamos que, tampoco se cometieron los errores segundo y tercero, señalados por la parte apelante.

En su *quinto* señalamiento de error, arguye la parte apelante que, la primera instancia judicial incidió al conceder $20,000.00 en compensación a pesar de no tener prueba al respecto. Coincidimos con tal apreciación. Nos explicamos.

Luego de una revisión concienzuda y desapasionada de la transcripción de la prueba desfilada, colegimos que el señor Friger Salgueiro no logró probar su causa de acción. Si bien es cierto que, la parte apelante no logró persuadirnos de que el trabajo audiovisual realizado por el señor Friger Salgueiro –incluyendo aquel en que aparecía su propia imagen– fuera hecho por encargo, la parte apelada tampoco logró establecer mediante prueba a esos efectos, cuantas veces la parte apelante divulgó o difundió su imagen sin su consentimiento.

Nos llama la atención el hecho de que, a pesar de que el foro primario consignó en su *Sentencia* que, de la prueba desfilada, [….] "no se logró especificar la cantidad de la ocurrencia ni la cuantía de la monetización supuestamente obtenida o beneficio económico recibido por el demandado", aun así, optó por concederle los daños estatutarios. A juicio nuestro, la parte apelada no cumplió con el peso de la prueba para establecer que, en efecto, ocurrió la utilización del material audiovisual producido por éste ni las veces en que se divulgó su imagen sin su previa autorización, según alegado.

Por último, solo nos resta determinar si incidió el foro primario al condenar a la parte apelante al pago de cuatro mil dólares ($4,000.00), por concepto de honorarios de abogado. Veamos.

Conforme se desprende del derecho previamente esbozado, la imposición de honorarios de abogado no procede en todos los casos, sino que, depende de la determinación discrecional que haga el tribunal en torno a si la parte perdidosa o su abogado, actuaron con temeridad o frivolidad, o de la existencia de una ley especial. Nuestro Alto Foro ha puntualizado que: "Sin duda, para reclamar honorarios de abogado y los intereses presentencia *es imprescindible* que se haya actuado con temeridad durante el trámite judicial. *SLG González-Figueroa v. Pacheco Romero*, supra, pág. 148.[27]

De un examen minucioso del expediente, con especial atención al trámite del caso, no se desprende que la parte apelante haya exhibido una conducta contumaz o temeraria en el presente caso. Como mencionamos, la *temeridad* se define como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables.[28] Tampoco podemos concluir que, al defenderse de la causa de acción en su contra, la parte apelante haya exhibido una actitud que se proyecte sobre el procedimiento y que haya afectado el buen funcionamiento y la administración de la justicia."[29] Huelga decir, que el foro primario no hizo una determinación de temeridad, previo a la imposición del pago de honorarios, tal como lo exige nuestro ordenamiento procesal.

Por otro lado, habida cuenta de que, en el caso de marras, el señor Friger Salgueiro no logró probar sus daños, tampoco procedía

---

[27] *Énfasis nuestro.*
[28] *Íd*; *Marrero Rosado v. Marrero Rosado,* supra.
[29] *Jarra Corp. v. Axxis Corp.*, supra, pág. 779.

la imposición de honorarios de abogado al palio del artículo 4 de la Ley 139-2011, *supra*, (2011).

En resumen, colegimos que, procede desestimar la *Demanda* que dio origen al recurso que nos atiene.

**IV**

Por los fundamentos que anteceden, se revoca la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones